*Attorney Grievance Commission v. John T. Riely*
Misc. Docket AG No. 20, September Term 2019

**Attorney Discipline – Competence, Diligence and Communication with Client – Misrepresentations – Indefinite Suspension**.  An indefinite suspension with a right to apply for reinstatement no sooner than one year is the appropriate sanction in a case in which an experienced immigration attorney neglected to act diligently to appear on behalf of an immigrant couple at status hearings in immigration court, failed to file a visa extension application on a timely basis on behalf of another client, and later made misleading statements to the latter client, an immigration enforcement agent, and Bar Counsel to conceal some aspects of his failure to represent that client competently and diligently.

Maryland Attorneys' Rules of Professional Conduct 19-301.1, 19-301.3, 19-301.4(a)&(b), 19-301.16(d), 19-304.1(a), 19-308.1(a), 19-308.4(a), (c)&(d).

Circuit Court for Montgomery County
Case No. 471876-V
Argued:  September 10, 2020

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 20

September Term, 2019

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

JOHN T. RIELY

_____

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Opinion by McDonald, J.
Watts, J., dissents.

_____

Filed:  November 25, 2020

In the practice of law it is often the case, as the saying goes, that the devil is in the details.   A lawyer's failure to attend to mundane aspects of representation can be detrimental to the client and violate the rules of professional conduct.   Misleading statements made to deflect attention from a lawyer's failure to "sweat the details" can exacerbate that violation.

Respondent John T. Riely is a Maryland attorney who, for most of the past 35 years, has primarily practiced immigration law from an office in Montgomery County.   By the account of the many current and former clients and his colleagues in the immigration bar, Mr. Riely has worked tirelessly on behalf of those in need of representation before immigration authorities.   Relatively late in his career Mr. Riely came to the attention of Bar Counsel as a result of two client matters to which he paid insufficient attention, and which at least temporarily put those clients at risk of removal from the United States.   In the case of one client, he made misleading statements to minimize his responsibility for the deficiency.

In 2016, a Guatemalan couple seeking asylum in the United States was referred to Mr. Riely for assistance.   Although the couple did not immediately pay the modest deposit required by the representation agreement and Mr. Riely initially believed that he had not been retained, he later learned that they had made the required payment some weeks after their meeting.   Nonetheless, he neglected to appear at their proceedings or to communicate to them that he would not be doing so, which resulted in a missed deadline, with serious potential consequences for the couple.

The second matter involved a Venezuelan client whom Mr. Riely had previously helped – to her great satisfaction – escape an abusive employment relationship while maintaining legal status in the United States under an employment-based visa.  Some years later, in 2017, she and her new employer sought Mr. Riely's assistance in obtaining an extension of that visa.  As a result of confusion caused when Mr. Riely mis-addressed an invoice to the client, Mr. Riely did not act on the timetable for obtaining the extension that he himself had specified.  He later made misleading statements to the client and an immigration enforcement agent as to whether he had made a required filing on the client's behalf by that deadline; in a later misrepresentation to Bar Counsel, he suggested that the client, rather than himself, was the cause of that deficiency.  Although he helped rectify the situation by confessing to immigration authorities that he had provided the client with ineffective assistance, he had placed her in jeopardy of removal from the country.

The misconduct was apparently not motivated by a desire to profit at the expense of these clients.  And, as a result of the efforts of successor counsel, in the end it does not appear that the clients, in either matter, are worse off for Mr. Riely's misconduct.  But, in both instances, the clients were seriously inconvenienced and their ability to remain in this country was put at significant risk without an appropriate adjudication of their cases under the immigration law – a risk for which Mr. Riely was largely responsible.

# I

## Background

### A.    *Procedural Context*

On August 16, 2019, the Attorney Grievance Commission, through Bar Counsel, filed a Petition for Disciplinary or Remedial Action against Mr. Riely, alleging that he had violated various provisions of the rules of professional conduct.[1]  In particular, Bar Counsel alleged that, in the course of two immigration matters, Mr. Riely had violated Rule 1.1 (competence); Rule 1.3 (diligence); 1.4 (a) & (b) (communication); Rule 1.16 (d) (declining or terminating representation); Rule 4.1 (a) (truthfulness in statements to others); Rule 8.1(a) (bar admission and disciplinary matters); and Rule 8.4 (a), (c), & (d) (misconduct).

Pursuant to Maryland Rule 19-722(a), we designated Judge John M. Maloney of the Circuit Court for Montgomery County to conduct a hearing concerning the alleged violations and to provide findings of fact and conclusions of law.  Judge Maloney conducted an evidentiary hearing on December 11, 12, and 13, 2019 and later issued an opinion containing his findings of fact and conclusions of law, as well as findings concerning aggravating and mitigating circumstances.

Mr. Riely filed one exception to the hearing judge's findings of fact and contested several of the hearing judge's conclusions of law.  Bar Counsel excepted to some of the hearing judge's findings regarding aggravating and mitigating circumstances and asked that part of the judge's opinion be stricken.  On September 10, 2020, we heard oral

---

[1] At the beginning of the pertinent time period, these rules were part of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") and codified in an appendix to Maryland Rule 16-812.  Effective July 1, 2016, the MLRPC were renamed the Maryland Attorneys' Rules of Professional Conduct ("MARPC") and recodified in Title 19 of the Maryland Rules.  For ease of reference, we will use the shorter designations of the MLRPC – *i.e.*, Rule 1.1 in lieu of Maryland Rule 19-301.1.  *See* Maryland Rule 19-300.1(22).

argument regarding these exceptions and the parties' recommendations as to an appropriate sanction.

## B.    *Facts*

To the extent that the parties have not excepted to the hearing judge's findings of fact, we treat those findings as established.  Maryland Rule 19-741(b)(2)(A).  When a party excepts to a fact finding, we review the record to ensure that the finding is supported by clear and convincing evidence.  We summarize below the hearing judge's findings of fact and other undisputed matters in the record, as they pertain to the alleged violations.

### 1.    Mr. Riely's Law Practice

Mr. Riely has been a member of the Maryland Bar since January 1985 and is also admitted to practice law in the District of Columbia.  At the outset of his career, he served as a trial attorney in California for a brief time for what was then known as the Immigration and Naturalization Service.  He then returned to Maryland where he joined a small general practice firm.  During the period of time relevant to this case, he was a solo practitioner and maintained a law office in Rockville, Maryland.   His practice has focused on representing clients in immigration matters.  According to Mr. Riely and corroborated by many of the witnesses at the hearing, he worked long hours, including late nights and weekends, to serve a large immigration clientele.

Beginning in 2014, Mr. Riely became affiliated in an informal "of counsel" capacity with a Rockville-based law firm called Pishevar & Mohammadi, P.C. ("the Pishevar firm").  Under that arrangement, the Pishevar firm would refer clients with immigration issues to Mr. Riely; he and the firm would share the fees. When Mr. Pishevar – Mr. Riely's

4

primary contact at the firm – suffered a personal tragedy and was increasingly absent from the firm, Maria Gajardo, an administrative assistant at the firm, became Mr. Riely's liaison to the firm.

2.     Representation of Immigrant Couple Subject to Removal Proceedings

*MC and CS are Arrested Upon Entry into the United States*

Some of the charges against Mr. Riely relate to the representation of an immigrant married couple from Guatemala.  We shall refer to the husband as MC and the wife as CS.[2] Their native language is K'iche' – a language indigenous to certain areas of Guatemala. CS also understands and can converse in Spanish but cannot read it.  MC has a more limited understanding of Spanish and relies on CS to translate Spanish conversations into K'iche'. Neither MC nor CS can speak or read English.  MC and CS are the parents of two young sons.

On March 20, 2015, MC and the older son entered the United States in Texas from Mexico.  They were apprehended by immigration agents and placed in removal proceedings.

CS and the younger son had remained in Guatemala where they witnessed a serious crime and were threatened by the perpetrators of that crime.  In September 2015, CS and the younger child traveled to the United States.  They were also apprehended and placed

---

[2] During the proceedings before the hearing judge, the couple's actual identities were filed under seal because of safety concerns related to certain events in Guatemala. Neither of them testified at the hearing of this matter.

in removal proceedings.  Immigration officials conducted what is known as a "credible fear" interview of CS concerning her eligibility for asylum in the United States.[3]

*MC and CS meet with Mr. Riely*

MC and CS apparently found their way to the Pishevar firm, and Ms. Gajardo contacted Mr. Riely.  On January 7, 2016, Mr. Riely met with MC and CS at the office of the Pishevar firm.  Ms. Gajardo, who speaks Spanish, served as translator.  MC and CS were provided with one of the Pishevar firm's written Immigration Retainer Agreement forms.  Pursuant to his arrangement with the Pishevar firm, Mr. Riely was responsible for determining the type of services to be provided and the amount of the fees to be charged.

The retainer agreement identified MC, CS, and their children as the clients. Paragraph 1 of the agreement stated that they were retaining and engaging the Pishevar firm for representation in deportation proceedings, including an application for political asylum on behalf of CS and a request that immigration authorities exercise prosecutorial discretion[4] in favor of MC.  Paragraph 1 of the agreement was partially translated into Spanish.  Paragraph 3 of the agreement, entitled "Representation," stated that "John T.

---

[3] Under the federal immigration law, a noncitizen who seeks asylum in the United States is to be interviewed by immigration authorities to determine whether the individual has a "credible fear of persecution."  The law defines "credible fear of persecution" to mean that "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the [immigration] officer, that the alien could establish eligibility for asylum" under the immigration law.  *See* 8 U.S.C. §1225(b)(1)(B)(v).

[4] The hearing judge noted that, in this context, "prosecutorial discretion" refers to the discretion that immigration authorities have to act – or not act – given the facts and circumstances of a particular case.

Riely, Esq., (of Counsel) is primarily responsible for providing services called for pursuant to this Agreement." The agreement stated that the fees would total $3,500, which were to be paid in the form of a $300 deposit followed by monthly installment payments of $150. The agreement provided that it would become effective upon payment of the "full initial engagement fee," presumably referring to the deposit.

Mr. Riely's typical practice, when meeting a new client in an immigration case, was to call the 800 telephone number of the Executive Office for Immigration Review to learn the history and procedural posture of a potential client's case. He testified that he believes he called this number during his meeting with MC and CS. In any event, Mr. Riely learned that CS had a master calendar hearing scheduled in the immigration court a week later on January 14, 2016 and that MC also had a hearing in the near future. At the meeting, Mr. Riely advised CS to have her January 14 hearing continued.

MC and CS did not have sufficient funds to pay the deposit when they met with Mr. Riely and Ms. Gajardo and did not sign the retainer agreement at that time. Mr. Riely retained the documents that they brought to the meeting, including a copy of the "credible fear" interview of CS. According to Mr. Riely, he did not know at that time whether the couple would ultimately retain him. The hearing judge noted that the lack of an executed retainer agreement does not preclude the formation of an attorney-client relationship, and

assumed that, although MC and CS did not sign the retainer agreement, the parties had formed an attorney-client relationship.[5]

After the meeting, Mr. Riely sent a Spanish version of an asylum application to MC and CS.  In a brief cover letter[6] accompanying the application, Mr. Riely asked MC and CS to complete the application and schedule a follow-up appointment with him.  Mr. Riely did not receive a response to the letter.

*MC Pays the Deposit*

Almost three weeks after the meeting with MC and CS, on the evening of January 27, 2016, Ms. Gajardo sent an email to Mr. Riely informing him that MC had paid the $300 deposit required by the retainer agreement.  In the same message, she told Mr. Riely she believed that MC had a hearing scheduled a few days later on February 2, 2016, and asked Mr. Riely to note the matter on his calendar.  Later that evening, Mr. Riely responded "ok" in an email and, in a second email sent at approximately 1 a.m., confirmed the February 2 hearing.  Almost immediately, however, he sent Ms. Gajardo a third email, in which he noted that he had another matter already scheduled for February 2 and that it made "no sense" for him to take MC's matter because he would have to pay another attorney to cover

---

[5] During his testimony at the hearing, Mr. Riely disclaimed any defense to the charges in this case based on the failure of MC and CS to sign the retainer agreement and pay the deposit at their initial meeting.

[6] The cover letter was in English.  Mr. Riely is not fluent in Spanish and explained that he typically corresponds with clients in English, as they generally have access to someone in their network or community who can help to provide a translation into the client's native tongue.  However, he testified that he did not know specifically whether MC and CS had contacts who could assist them with English translations.

8

MC's hearing.  The next morning, Ms. Gajardo responded in an email that she was unaware

of that arrangement and that she had believed Mr. Riely was going to represent MC.  Mr.

Riely again responded "ok."

Mr. Riely and Ms. Gajardo corresponded further about MC's matter by email on

January 31.  Ms. Gajardo reminded him that MC had paid the $300 deposit to retain him;

Mr. Riely did not indicate that he would not cover the February 2 hearing.

The hearing judge found that Mr. Riely never informed MC that he would not be

appearing at his February 2 hearing.

*Mr. Riely Does Not Appear at MC's Hearing*

On February 2, MC and his son appeared before an immigration judge.  Mr. Riely

was not present.  MC informed the immigration judge that he had made arrangements to

be represented by an attorney, but that he did not know why the attorney was not present.

The immigration judge confirmed by phone with the Pishevar firm that Mr. Riely was

expected to attend the hearing.   As a result, the immigration judge granted MC a

continuance and postponed his hearing until December 12, 2016.  Later that day, Mr. Riely

encountered the immigration judge, who informed him that she had granted the

continuance and that he should contact his client.

The hearing judge found that Mr. Riely did not contact MC.

*Mr. Riely Does Not Appear at CS's Hearing*

On the evening of February 3, 2016, at 6:16 p.m., Mr. Riely emailed Ms. Gajardo

that CS's master calendar hearing at the immigration court was scheduled for May 12, 2016

and that MC's rescheduled hearing was set for December 12, 2016.  In her reply email, Ms.

Gajardo asked him to provide her with a copy of his entry of appearance form for MC's matter. A few weeks later, on February 20, 2016, Ms. Gajardo emailed Mr. Riely and, among other things, inquired if he had filed the entry of appearance form in MC's matter. Mr. Riely never replied to that inquiry. Mr. Riely, in fact, never filed an entry of appearance in MC's matter.

On April 15, 2016, Ms. Gajardo emailed Mr. Riely and requested status updates on several matters, including those of MC and CS. After recapping the events up to that date with respect to MC and CS, Ms. Gajardo wrote:

> The family did not give their second payment on the contract signed as of yet waiting for you to confirm your appearance. [CS] has a [hearing] that she continued from Jan 14th per your [advice] to May 12 at 1 pm before [an immigration judge] in Baltimore. Please advise if you will continue to represent this family. If not, I will have to return their money as we have not been able to comply with their services and give them a chance to obtain counsel immediately for their upcoming hearing.

Mr. Riely did not reply to that email.

A week later, on April 22, 2016, Ms. Gajardo again emailed Mr. Riely seeking a response to her earlier inquiry. The next day, Mr. Riely replied to Ms. Gajardo stating that he would "pull [CS]" and noted "I dont see that on my calendar but I will check That is the problem These guys come in sign contracts and then they never pay again."

Mr. Riely attempted to contact MC and CS on April 26, 2016 by sending them a brief letter in which he described an unsuccessful attempt to reach them by telephone and requested that they let him know "how they wished to proceed."[7] MC and CS did not

---

[7] Like his prior letter to the couple, that letter was in English. See footnote 6 above.

respond to the April 26 letter.  Before the hearing judge, Mr. Riely testified that at the time

he sent the letter he considered MC and CS to be his clients.  He did not recall any other

attempts to communicate with MC and CS between February 3, 2016 and April 26, 2016.

On May 6, 2016, Ms. Gajardo emailed Mr. Riely, asking about the status of his

representation of CS.  He replied to the email, "Yes I have it on my calendar as well."  On

May 11, 2016, Ms. Gajardo wrote Mr. Riely in an email:

> Also, … [CS's] case, I do not know if you will be representing her or
> not.  They gave an initial retainer but you never filed [an entry of
> appearance] and had advised her to continue her last hearing to give
> them some time to pay.  This is the case that you showed up late at the
> [immigration court] for the husband.  I am hesitant to call them but I
> imagine that they think you will be representing them.  Please let me
> know what you would like for me to do.

In a reply to Ms. Gajardo, Mr. Riely stated:  "If they paid, … I will be there tomorrow."

On May 12, 2016, CS and her son had a master calendar hearing in immigration

court in Baltimore.  Mr. Riely was at the courthouse that day, but he was not present when

CS's case was called and he did not enter his appearance as CS's attorney.  Mr. Riely

testified that he did not speak to CS or attempt to confirm the status of his representation

because he was unable to recognize her.  Mr. Riely was only aware that CS's case was

called on May 12 because he reviewed the docket entries for the cases called that day.

*Mr. Riely Terminates His Representation of MC and CS*

On the evening of May 12, 2016, Mr. Riely emailed Ms. Gajardo that he was going

to close his file relating to the couple.  He wrote:

> [The immigration judge] continued their case until October for a Master
> [calendar hearing].  I did not enter my appearance.  They were there.

11

Like you, I have an unsigned contract.  It was not signed by them or by me or anybody at your firm.

They were to pay a $300.00 retainer and a $150.00 per month and I don't see a record of any of that being done.  I am going to close or send back this file.

This was pending since Jan. 2016 and they have chosen not to go forward from what I can see.

So I am closing it down.

Before the hearing judge, Mr. Riely conceded that MC and CS had paid the $300.00 retainer as required by the retainer agreement.  He did not personally notify MC or CS that he was terminating his representation in their immigration matters.  He did not recall if he had provided Ms. Gajardo with any instructions to let MC and CS know that he would no longer be representing them.  Mr. Riely had no communications with MC or CS after May 12, 2016.

The delay in CS's case could have affected the outcome of her application for asylum.  As of 2016, the immigration law required that an asylum application be filed within one year of the individual's entry into the United States.[8]  As Mr. Riely was aware, CS had a potential basis for asylum and had entered the United States with her son on September 11, 2015, but he did not inform CS that an asylum application had to be filed within one year of that date.  The hearing judge found that Mr. Riely failed to take any steps or provide any guidance to MC and CS to protect their interests when he terminated his representation of them.

---

[8] 8 CFR §208.4(a)(2) & 1208.4(a)(2)  (2016).

12

*MC and CS Obtain Successor Counsel*

MC and CS later obtained successor counsel to handle their immigration matters. Before the hearing judge, the successor counsel testified that she was able to persuade an immigration judge to excuse CS from meeting the one-year deadline to apply for asylum. However, the immigration judge ultimately held on the merits that CS was not eligible for asylum. That decision has been appealed, and MC, CS, and their children were allowed to remain in the United States while their appeal is pending.

3.      Representation of Mariana Fernandez Gonzalez

The charges against Mr. Riely were also based on his representation of Mariana Fernandez Gonzalez during 2017 in connection with renewal of her H-1B visa. An H-1B visa is a nonimmigrant visa that allows an employer in the United States to employ a noncitizen worker on a temporary basis in this country in an occupation requiring "theoretical and practical application of a body of highly specialized knowledge" and certain educational attainment. To ensure that the program does not adversely affect the domestic workforce, the wage that the employer pays an employee with an H-1B visa must meet or exceed the "prevailing wage" in the particular occupation.[9]

*Mr. Riely's Past Efforts on Behalf of the Client*

Several years before the events at issue in this case, Mr. Riely had represented Ms. Fernandez Gonzalez – to her great satisfaction – in an issue that arose in connection with her initial H-1B visa.

---

[9] *See* 8 U.S.C. §1101(a)(15)(H)(i)(b), §1182(n)(1)(A)(i), and §1184(i)(1).

Ms. Fernandez Gonzalez, a native of Venezuela, originally entered the United States on January 27, 2014 on an H-1B visa to work for a newspaper.  However, she encountered an increasingly hostile work environment and significant mistreatment by her employer, including the employer's failure to pay the agreed-upon wages.  As a result, Ms. Fernandez Gonzalez sought new employment after a few months in that job.  She obtained a new position as a public relations and marketing specialist for an insurance agency in Baltimore City affiliated with the Allstate Insurance Company.  Originally operating under the name "Good Hands Insurance," the agency, which was owned by Carlos Sanchez, was later renamed "Sanchez Insurance."

Mr. Riely assisted Ms. Fernandez Gonzalez in 2014 in transferring her H-1B visa from the newspaper to her new employer.  He also filed a wage claim against the newspaper with the United States Department of Labor, which resulted in a monetary award in favor of Ms. Fernandez Gonzalez for the full amount of the back wages, as well as interest and penalties.

*The Client Asks Mr. Riely for Help with a Visa Extension*

Ms. Fernandez Gonzalez's H-1B visa was due to expire in July 2017.  In January 2017, she again sought out Mr. Riely for help in obtaining an extension of the visa.  Ms. Fernandez Gonzalez and Mr. Riely met on January 11, 2017.  At that time, Mr. Riely advised her that the application to extend her visa should be filed by April of that year.

Although the specific amount of the fees for the visa extension was not discussed at the January meeting, Mr. Riely told Ms. Fernandez Gonzalez that they would be "about the same" as when he had assisted her with the visa in 2014.  Ms. Fernandez Gonzalez also

14

understood that the sponsoring employer – Mr. Sanchez – was required by law to pay the fees owed to United States Citizenship and Immigration Services ("USCIS") related to extension of an H-1B visa.  Mr. Sanchez also was aware of that requirement.

*A Mis-addressed Invoice for Immigration Fees*

A few days after meeting with Ms. Fernandez Gonzalez, on January 16, 2017, Mr. Riely sent an invoice for "H-1B fees" to Mr. Sanchez and Good Hands Insurance.  That invoice sought payment for "H-1B Fees" totaling $1,210.00, itemized as $460.00 for "I-129 Base Fee" and $750.00 for "ACWIA Fee."[10]  The invoice included instructions to make the check payable to the government agency and that the check should be drawn on the employer's account.

Unfortunately, Mr. Riely mistakenly addressed the invoice to Mr. Sanchez at *1512* Light Street in Baltimore City.  In fact, Mr. Sanchez's insurance agency had been located at 1609 Eastern Avenue in Baltimore City since 2012.  (Previously, it had been briefly located at *1412* Light Street.)

Mr. Sanchez never received the mis-addressed invoice, nor did Ms. Fernandez Gonzalez.  Mr. Riely apparently failed to realize his error at the time.  At the hearing, Mr. Riely testified that he had no record of resending that invoice to Mr. Sanchez or Ms. Fernandez Gonzalez and did not recall doing so.

---

[10] Form I-129 is a USCIS form entitled "Petition for a Nonimmigrant Worker" that is to be filed with the agency by a sponsoring employer in support of an application for an H-1B visa.  According to Mr. Riely, the "ACWIA Fee" referred to a payment required under the American Competitiveness and Workforce Improvement Act in conjunction with the filing of a Form I-129.

*The Client's Employer Pays Mr. Riely's Legal Fee*

On the evening of January 24, 2017, Mr. Riely initiated a series of five emails to Ms. Fernandez Gonzalez with different subject lines, sent minutes apart, between 8:46 p.m. and 9:01 p.m.  He asked Ms. Fernandez Gonzalez several times for her new office address, and she replied the same evening and provided Sanchez Insurance's correct address of 1609 Eastern Avenue.

The following day, on January 25, 2017, Mr. Riely generated and sent Ms. Fernandez Gonzalez an invoice for "Legal fees pertaining to your H-1B" in the amount of $1,500.00.  That invoice was addressed to both "Allstate Ins." at 1609 Eastern Avenue and to Ms. Fernandez Gonzalez at her home address.  Both Mr. Sanchez and Ms. Fernandez Gonzalez received the invoice.

Ms. Fernandez Gonzalez confirmed receipt of Mr. Riely's invoice for legal fees in an email on January 29, 2017.  She advised Mr. Riely that she intended to ask Mr. Sanchez for an advance to pay the invoice and, recalling that the USCIS fees had amounted to $1,500.00 when she had originally obtained an H-1B visa, asked Mr. Riely whether they would be the same so that she could give her employer, Mr. Sanchez a "heads up."  In a reply email, Mr. Riely confirmed that the USCIS fees would be "approximately the same." However, he did not quote a specific figure or indicate that he had already sent an invoice for those fees in the amount of $1,210 – the invoice that he had sent to the wrong address on January 16, 2017.  He did not resend that invoice at that time or otherwise inform Ms. Fernandez Gonzalez (or Mr. Sanchez) of the amount of fees that Sanchez Insurance was to pay to USCIS as the petitioning employer.

16

Shortly after sending the invoice for legal fees, Mr. Riely received a check drawn on the insurance agency's bank account in the amount of $1,500.00.[11]

*Mr. Riely Fails to be Responsive to the Client's Inquiries*

As recounted above, Mr. Riely had told Ms. Fernandez Gonzalez in January that her visa extension application should be filed during April 2017.  On April 21, 2017, Ms. Fernandez Gonzalez emailed Mr. Riely with the subject line "Is everything ok with my file?"  Mr. Riely immediately replied "yes."  The email thread continued with a brief exchange about the status of the complaint Ms. Fernandez Gonzalez had filed with the Department of Labor against her previous employer.

A few weeks later, on May 2, 2017, Ms. Fernandez Gonzalez sent Mr. Riely an email informing him that she had won "a trip to the Bahamas with Allstate" for the end of July, and asked him if he thought her visa would be renewed by then.  Mr. Riely replied that same day that he was "[p]retty sure we can make it happen."

A few weeks later, on May 25, 2017, Ms. Fernandez Gonzalez emailed Mr. Riely inquiring on behalf of Mr. Sanchez whether her employer had already paid sufficient funds to Mr. Riely for the fees required by USCIS.  Mr. Riely did not reply to that inquiry.  The next day, Ms. Fernandez Gonzalez sent Mr. Riely a follow-up email with the same inquiry. Mr. Riely did not reply to the follow-up email.

---

[11] As Mr. Riely and Mr. Sanchez both testified at the hearing and as documented by an exhibit admitted at the hearing, Mr. Riely refunded this fee to Mr. Sanchez within a week after his representation was terminated.

On June 5, 2017, Ms. Fernandez Gonzalez sent Mr. Riely an email with the subject line "Two questions."  The first question within the email was "Is my file OK?"  The second question inquired, for the third time, whether her employer needed to send another check for USCIS fees.  Mr. Riely did not reply to the June 5 email.

Another week later, on June 12, 2017, Ms. Fernandez Gonzalez sent Mr. Riely an email with the subject line "Really worried" in which she again asked about the status of her "papers," made reference to the April deadline Mr. Riely had mentioned during their meeting in January, and expressed concern about the impending expiration of her H-1B visa in July.  She asked for the fourth time whether her employer needed to provide an additional check for the USCIS fees.  Mr. Riely did not reply to the June 12 email.

The next day, June 13, 2017 at 5:00 p.m., Ms. Fernandez Gonzalez sent Mr. Riely an email with the subject line "Receipt Number - DL" and informed Mr. Riely that she needed the receipt number for the filing of her H-1B visa extension application in order to get an extension of her Maryland driver's license.  He replied minutes later writing "sure" and "stand by."  However, he provided no information within that email thread and did not follow up with any further update about the visa extension for Ms. Fernandez Gonzalez.

In the meantime, Mr. Sanchez had also emailed Mr. Riely on June 8, 2017, and again on June 22, 2017, to ask whether he needed to send a second check to Mr. Riely in connection with Ms. Fernandez Gonzalez's visa extension.  Mr. Riely emailed in response to the second message:  "Sure will get back to you tonight."  Two days later on June 24, 2017 at 1:41 p.m., Mr. Sanchez replied: "Thank you, I look forward to hearing from you." Mr. Sanchez did not receive any response from Mr. Riely after sending the June 24 email.

18

By the end of June, Ms. Fernandez Gonzalez had not heard from Mr. Riely since he had sent his "sure … stand by" email reply on June 13, 2017.  On July 1, 2017, she sent Mr. Riely an email with the subject line "URGENT ANSWER!"  She expressed several concerns related to her employment, including the impending expiration of her H-1B visa in approximately one week and the resulting loss of her driver's license.

Mr. Riely did not reply for more than a week, until the evening of July 9, 2017, when he sent an email stating that he would call her that evening.  However, he did not call her that night as promised.  The next day, on July 10, 2017, at 7:05 a.m., he sent Ms. Fernandez Gonzalez an email instructing her to call him on his cell phone in one hour.  Ms. Fernandez Gonzalez did not have his cell phone number at that time and replied promptly by email to that effect.  At some point after sending her email reply the morning of July 10, 2017, Ms. Fernandez Gonzalez received his cell phone number from him.

*Mr. Riely Gives False Assurances After the Visa Expires*

By early August, Ms. Fernandez Gonzalez knew her H-1B visa had expired, but believed that an extension application was in the works.  On August 4, 2017, Ms. Fernandez Gonzalez sent Mr. Riely an email with the subject line:  "Hi.  Did you send the forms?  Carlos [Sanchez] is asking cause I need to have the receipt number for Allstate as well.  Thanks!"  The email contained no other content beyond the subject line.  Mr. Riely did not reply to the August 4 email.

On August 9, 2017, Mr. Riely met Mr. Sanchez at a restaurant in Baltimore near the Sanchez Insurance office, where he presented Mr. Sanchez with a document titled "Labor Condition Application for Nonimmigrant Workers" ("LCA"), which required Mr.

19

Sanchez's signature.  That document was to be filed with the United States Department of Labor and then submitted to USCIS as a supporting exhibit with the Form I-129 to document the relevant prevailing wage.  Mr. Riely had outsourced completion of the LCA for Mr. Sanchez to an attorney in Minnesota who specialized in the determination of the relevant prevailing wage.  While the LCA was a necessary part of the supporting package of documents to be submitted with the Form I-129, the LCA was not itself the application by which the process of extending Ms. Fernandez Gonzalez's H-1B visa would be initiated.

Late in the day on August 28, 2017, Ms. Fernandez Gonzalez sent Mr. Riely an email with the subject line "Hi.  Did you file our documents already?"  Mr. Riely answered "Yes."  Ms. Fernandez Gonzalez interpreted his reply as confirmation that USCIS had received her H-1B visa extension application, and thanked him in a reply email.  In fact, Mr. Riely never filed a Form I-129 or any supporting documentation with USCIS in 2017 for the purpose of extending Ms. Fernandez Gonzalez's H-1B visa.

On September 7, 2017, Ms. Fernandez Gonzalez sent Mr. Riely a follow-up email with the subject line "Concern," asking for the receipt number for the filing and noting that it did not usually take long to obtain one.  Mr. Riely did not reply to that email.

On September 18, 2017, Ms. Fernandez Gonzalez sent Mr. Riely an email in which she yet again asked when he thought she would receive a receipt number for the filing that he had led her to believe he had made to extend her H-1B visa.  She also reminded Mr. Riely that she had not had a driver's license since July.  Mr. Riely replied to that email: "Yes I agree we will follow up right now."

A week and a half passed with no further word from Mr. Riely.  Ms. Fernandez Gonzalez sent him another email late in the day on September 29, 2017 with the subject line "Did you find out something about our receipt number?"  In another email later that evening, she expressed growing concern about the impact the lack of a visa extension and a driver's license was having on her job responsibilities.  She again inquired about obtaining a receipt number, noting it had "been more than a month."  Mr. Riely did not reply to either of Ms. Fernandez Gonzalez's September 29 emails.

### *Mr. Riely Asserts that the Client's Employer Failed to Pay Fees*

Late on October 11, 2017, Ms. Fernandez Gonzalez sent Mr. Riely an email with the subject line "Read this please."  In that email, she reminded him of some of his prior statements regarding her H-1B extension application, and reiterated the problems that the situation was causing for her at work.  She again inquired about a receipt number related to the filing of the application.  She asked him to "please answer me something more than an ok, or that I'm right."

Mr. Riely replied the next day and offered to meet Ms. Fernandez Gonzalez.  Mr. Riely met with Ms. Fernandez Gonzalez and her husband at a coffee shop in Baltimore later that day.  At that meeting, Mr. Riely informed Ms. Fernandez Gonzalez that he had used "the first $1,500" paid by Mr. Sanchez to file her paperwork, but that he still needed payment for his attorney's fees.  Mr. Riely agreed to send her copies of what he had filed on her behalf.  In an email to Mr. Riely later that day, Ms. Fernandez Gonzalez included the following statements about her case:

Im so sorry i didnt pay you.  I will fix that as soon as possible …

21

You agreed to help me today to ask for my receipt number and anything that can help me with the [Motor Vehicle Administration ("MVA")] to get an extension.

\* \* \*

You also agreed to send me the copies of my file that was sent to immigration as you always do.

*DHS Comes for the Client*

On October 13, 2017, the day after Mr. Riely met with Ms. Fernandez Gonzalez, agents of the United States Department of Homeland Security ("DHS") appeared at the Sanchez Insurance office in Baltimore looking for her.  They served Ms. Fernandez Gonzalez with a document known as a "Call-In Letter," directing her to appear on October 19, 2017 at the DHS office in Baltimore.

Ms. Fernandez Gonzalez sent Mr. Riely a text message informing him of what had occurred with a photograph of the Call-In Letter.  Mr. Riely texted back "This is war."  In a series of text messages with Ms. Fernandez Gonzalez, Mr. Riely repeated his use of the word "war" to describe the DHS action.  However, he did not inform her that he had failed to file a Form I-129 or any other papers with USCIS to extend her H-1B visa.

*Mr. Riely Accompanies the Client to DHS and Makes Misleading Statements to DHS*

Mr. Riely agreed to accompany Ms. Fernandez Gonzalez to her meeting with DHS on October 19, 2017.  At the meeting, Ms. Fernandez Gonzalez was briefly detained by DHS for remaining in the country beyond July 9, 2017 without authorization, was advised that removal proceedings were to be commenced against her, and was released on her own recognizance.

22

When he attended Ms. Fernandez Gonzalez's meeting with the DHS agent on October 19, 2017, Mr. Riely brought no documents with him.  He falsely told the DHS agent that he could not understand why the agency could not find a receipt for the filing of Ms. Fernandez Gonzalez's H-1B extension application.  At that time, he knew that he had not filed a Form I-129 or any other documents that would have generated a receipt.

In describing that meeting to the hearing judge, Mr. Riely testified that his intent at the meeting was "to change the temperature in the room" and "to change the topic."  He conceded that he had "lecture[d] and lambaste[d]" the DHS agent for taking a law enforcement action against his client.  He admitted to speaking to the DHS agent in "rather unflattering tones and rather accusatory tones" while using language that "may have been a little bit coarse."  While Mr. Riely could not say "for certain" whether the DHS agent asked him for a receipt number pertaining to an I-129 filing, he acknowledged that he had "probably" told the DHS agent that he would send papers establishing that an I-129 had been filed when he knew, in fact, that it had not.

*Mr. Riely Deflects the Client's Requests as DHS Proceeds Against Her*

After the meeting with the DHS agent, Ms. Fernandez Gonzalez texted Mr. Riely later that day, asking whether he thought that her file could be lost in the mail.  She also asked that he copy her when he emailed the DHS agent.

The next day, October 20, 2017, Ms. Fernandez Gonzalez texted Mr. Riely "Hi, mr. John.  You told [the DHS agent] you will send the documents yesterday or today first thing in the morning but I don't see them.  Did you sent [sic] them?  We couldn't sleep last night."  Mr. Riely replied, "No but I will when I get back to the office."

Ms. Fernandez Gonzalez and Mr. Riely exchanged additional text messages over the next three days.  In her texts, Ms. Fernandez Gonzalez asked about documents that Mr. Riely was purportedly going to send to the DHS agent.  Mr. Riely repeatedly promised to send her documentation that a filing had been made with USCIS when he was aware that nothing had been filed.

On November 3, 2017, Ms. Fernandez Gonzalez texted Mr. Riely requesting an update, but received no reply.  A few days later, she sent him an email in which she asked Mr. Riely to send her file to her.  She explained that she believed it would contain a form with the receipt for the H-1B visa extension that had supposedly been filed on her behalf, which she planned to provide to the MVA in order to renew her driver's license.  Mr. Riely replied, "yes when can we meet," but he did not provide the requested form, which did not exist, nor did he provide any other information.

On November 7, 2017, the immigration court notified Ms. Fernandez Gonzalez that a hearing in her removal proceeding was scheduled for May 15, 2019.  On November 16, 2017, Mr. Riely entered his appearance as Ms. Fernandez Gonzalez's attorney in that matter.

On December 2, 2017, Ms. Fernandez Gonzalez sent Mr. Riely an email with the subject line "MVA news," reiterating her request for the receipt number needed to obtain reissuance of her driver's license.  In that email, she pointed out that she had been waiting to receive that information for several months.  Mr. Riely did not reply to the December 2 email.

*Mr. Riely Misleads the Client about Her "Missing" Application*

On December 6, 2017, Ms. Fernandez Gonzalez texted Mr. Riely to inform him that Mr. Sanchez had learned from USCIS that there was no record that an H-1B extension application had been filed for her that year.  She asked for Mr. Riely's assistance in documenting for USCIS that he had previously sent in the application and in resending it. Over the next few days, Mr. Riely sent her additional text messages suggesting that he could "reconstruct" the packet of materials that he had supposedly already sent to USCIS. For example, on December 13, 2017, Ms. Fernandez Gonzalez texted as follows:  "Hi, mr. John.  Did you send the email with my case to immigration?  To see if they can find the file?"  He replied, "Hard copy yes."

In fact, Mr. Riely had not filed a Form I-129 or any other documents with USCIS for the purpose of extending Ms. Fernandez Gonzalez's H-1B visa at any time during 2017 and knew that to be the case while he was exchanging text messages with Ms. Fernandez Gonzalez in December 2017.

*The Client Terminates Mr. Riely's Representation and Retains Successor Counsel*

On December 21, 2017, Ms. Fernandez Gonzalez and Mr. Sanchez went to the USCIS office in Baltimore to obtain information about her visa extension.  They were informed that USCIS had no record of receiving an extension petition or application filed on behalf of Sanchez Insurance to continue employing Ms. Fernandez Gonzalez under an H-1B visa beyond July 9, 2017.  That evening, Ms. Fernandez Gonzalez sent Mr. Riely an email discharging him as the attorney for her and Sanchez Insurance.  She wrote:

Hi John,

First, I wanted to let you know that Carlos Sanchez and I went to [USCIS] today 12/21/17. I spoke to an immigration officer in reference to my H1B visa and the request for a H1B extension that you allegedly sent them. USCIS was not able to find any file for my HIB Visa case. They requested a receipt number, which I could not provide because you never gave it to us. Please note that we requested this USCIS receipt from you several times, to no avail. Learning from an immigration officer that there is no trace of my application in their system nor evidence that you submitted the application is the last straw.

I am very upset about this situation. It caused me to lose my driver's license and prevented me from driving my own car for months, forcing me to inconvenience others and incur substantial unnecessary transportation expenses. More importantly, however, because USCIS never received my extension request, I fell out-of-status and three (3) [DHS] officers went to my job to process me for Removal Proceedings before the Immigration Court. Had you been more diligent, I would not be in this <u>dreadful</u> situation at all. I would also like to point out that when you and I met with the [DHS] agent who placed me into Proceedings, you did not bring any documentation to establish that you had timely filed my H1B extension. This entire situation is highly unfair and is causing me significant emotional and physical stress.

Second, I want to inform you that effective today, December 21, 2017, Neither I nor Carlos Sanchez no longer wish to be represented by you. Please provide me with a copy of my entire file as soon as possible. You may send it to me electronically to this email address, or you may mail it to me at my home [address]. In addition, please return the funds that my employer, Good Hands Insurance, paid to you for USCIS filing fees.

Ms. Fernandez Gonzalez engaged successor counsel, both to secure a belated extension of her H-1B visa and to deal with the removal proceeding against her.

### Mr. Riely Writes a Letter in Support of the Client

At the request of successor counsel, Mr. Riely wrote a letter for submission to both DHS and USCIS in support of a belated H-1B extension request and a motion to dismiss

the removal proceedings.  In that letter, dated January 18, 2018, Mr. Riely provided the

following explanation for his failure to file the I-129 petition for an extension of Ms.

Fernandez Gonzalez's H-1B visa:

> After receiving the legal fees, I caused the I-129 and the supporting materials and memorandum to be drafted and further caused the LCA to be prepared and filed.  When I did not receive the filing fees from Sanchez Insurance, I tabled the file while waiting to receive the fees.  When the fees did not arrive, I did not transmit the H-1B petition for Ms. Fernandez Gonzalez to USCIS.
>
> I wish to be very clear on this matter.  In retrospect, I believe I did not do a very good job of communicating the two fees that Sanchez Insurance owed.  I know that I was not clear in communicating the fees owed to Carlos Sanchez, and even less so to the alien beneficiary, Ms. Fernandez Gonzalez.  With the benefit of hindsight, I wish I had been more forthcoming in explaining to Carlos Sanchez and Ms. Fernandez Gonzalez that I needed the second fee to complete the case.  I was not forthcoming, and as a result there was some ambiguity about the fees which I did not make my best efforts to clear up.  I very much regret not being clearer on that point and not being more direct.
>
> What I find most regrettable is while I took a hard line position by not taking action on the case without receiving the filing fees, I did not communicate my position effectively to either Carlos Sanchez or Ms. Fernandez Gonzalez.  This regret stems from the fact I had done fairly extensive work for Ms. Fernandez over the years.  Ms. Fernandez Gonzalez sent me many emails and text messages between March and December 2017, asking whether I had filed the petition for her H-1B extension and requesting a copy of the USCIS receipt notice.  We also had some discussion in which I was asked if the second check for fees had arrived, and I replied no, but I never clearly explained to Ms. Fernandez Gonzalez that I had stopped working on her case while waiting for the second fee.  I now understand that I led Ms. Fernandez Gonzalez and her employer to believe that I had filed their petition when in fact I had not.  I had done work for both Carlos Sanchez and Ms. Fernandez Gonzalez for several years and on multiple issues, and I owed them a clearer signal on my position.  I concede that I failed them by not effectively communicating my position on the failure to pay the full fees, and I regret that.  The legal fees that Sanchez Insurance

paid me were placed in escrow, and I returned them to Carlos Sanchez
several weeks ago.

The hearing judge found that some of Mr. Riely's statements in that letter were misleading. In particular, the hearing judge found that, although Mr. Riely had done some drafting, the petition and supplemental materials were incomplete.[12] Mr. Riely admitted in his testimony that he had not worked on a supporting memorandum in 2017, and that there was "[p]robably no good reason" why he stopped working on the Form I-129 submission. The hearing judge concluded that Mr. Riely did not *complete* the Form I-129 and the supporting materials and memorandum, and, accordingly, that the statement in his January 18, 2018 letter to immigration officials that suggested he had set aside completed forms simply to await the payment of fees was misleading.

The hearing judge also found that Mr. Riely's statement in the letter that he had *told* Ms. Fernandez Gonzalez that a second check for fees had not arrived was false. The hearing judge found that Mr. Riely ignored or did not respond to numerous inquiries from both Ms. Fernandez Gonzalez and Mr. Sanchez about the need for a "second check," despite Mr. Sanchez's willingness and ability to pay upon request any government fees needed in connection with Ms. Fernandez Gonzalez's H-1B visa extension.

While Mr. Riely admitted in the letter that he "did not do a very good job of communicating the two fees that Sanchez Insurance owed" and that "there was some ambiguity about the fees which I did not make my best efforts to clear up," the hearing

---

[12] At the hearing, Mr. Riely introduced the draft of a Form I-129 and supplemental materials totaling 54 pages.

28

judge found that, in fact, he was not responsive to Ms. Fernandez Gonzalez or Mr. Sanchez on the subject of fees.

*The Client Complains to Bar Counsel – Mr. Riely's Response*

On February 6, 2018, Ms. Fernandez Gonzalez sent Bar Counsel a complaint about Mr. Riely's representation.  In response to an inquiry from Bar Counsel, Mr. Riely provided a written response dated March 1, 2018, and enclosed a copy of his January 18, 2018 letter to DHS and USCIS.  In his March 1, 2018 response to Bar Counsel, Mr. Riely claimed to have told Ms. Fernandez Gonzalez on "multiple occasions" that the filing fees due from her employer had not been received.  The hearing judge found that Mr. Riely misrepresented to Bar Counsel that Ms. Fernandez Gonzalez had told him the fee "would be forthcoming but it never was" and that on one occasion, "she said she was bring [sic] the fees, but she did not do so."[13]  In the letter, Mr. Riely acknowledged that "Ms. Fernandez Gonzalez is a very bright woman and very organized," as well as "very nice," and wrote that she was "a valuable asset to her employer which made it unclear why management did not pay the required filing fees."

---

[13] Mr. Riely excepts to the hearing judge's conclusion that he misrepresented to Bar Counsel who was at fault for the failure of Mr. Sanchez to pay the fees for the H-1B visa extension.   While conceding that "clarity does not shine" in his email and text communications with the client, he points to an October 2017 email (quoted earlier in the text of this opinion) in which Ms. Fernandez Gonzalez apologized for failing to pay his legal fees.  From our review of the record, it appears that the confusion over the payment of fees can be traced to Mr. Riely's mistake in mis-addressing the invoice for H-1B fees – a mistake he never acknowledged or corrected.   His affirmative representation to Bar Counsel that Ms. Fernandez Gonzalez was at fault for the fee deficiency appears to evidence – at the very least – similar carelessness.  This exception is overruled.

The hearing judge found that Mr. Sanchez did not pay the required filing fees as a result of Mr. Riely's lack of responsiveness and clarity in communications with Ms. Fernandez Gonzalez and Mr. Sanchez.  The hearing judge also found Mr. Riely's written statements that he "consistently told [Ms. Fernandez Gonzalez] no" when she asked if the filing fee had been sent and that she "said it would be forthcoming but it never was" were false.

*Epilogue – The Client's Visa is Extended*

Successor counsel filed a Form I-129 with supporting documentation on behalf of Sanchez Insurance to belatedly extend Ms. Fernandez Gonzales's H-1B visa.  As a result, USCIS approved the extension of Ms. Fernandez-Gonzalez's H-1B visa retroactive to July 10, 2017.  Also, as a result of the efforts of successor counsel, the immigration court granted the motion to terminate the removal proceeding against Ms. Fernandez Gonzalez.

4.     Evidence of Mr. Riely's Character and Reputation

Four attorneys testified about Mr. Riely's work ethic, commitment to his family, expertise in the practice of law, and competency as a practitioner.[14]  The hearing judge found these witnesses to be "exceedingly credible in their testimony."

---

[14] Steven Bou testified that Mr. Riely was a "valuable asset" who would "always make himself available" when immigration questions arose in Mr. Bou's own practice.  Mr. Bou also spoke about the "great deal of compassion for other people" that Mr. Riely exhibits and his fairness in dealing with others.

William Scanlon testified to his confidence in Mr. Riely, relating that he had referred family members, neighbors, friends, and college classmates to Mr. Riely to represent them in sensitive legal matters, knowing that Mr. Riely had a "knowledge of the issues" and "concern on a personal level for the individuals involved."

In addition, seven past and current clients[15] from Guatemala, Zambia, Uganda, Iran, Turkey, and England testified extensively about their positive experiences working with Mr. Riely, and attested to his character, his skill as an immigration attorney, and the favorable outcomes he had achieved for them, their family, and friends.  One former client testified that Mr. Riely was "the one responsible for my green card, to the point where I have a job, a good job" and that "he's been very good, excellent lawyer," further stating that the client had "recommended friends and so on and I would still recommend him to anybody who needs assistance, especially immigration assistance."  Another former client stated that Mr. Riely did an "excellent job" assisting both her and her sons with their immigration matters, and that she "trust[s] him with all my heart."

A third former client testified that he refers friends and family in need of immigration assistance to Mr. Riely "without hesitation.  A fourth former client expressed his satisfaction with Mr. Riely's representation, noting that "he's a professional, a man of a good moral character, a lawyer that I can trust, a lawyer that I can refer to other people." Yet another former client stated that she has "much, much respect, a lot of respect for [Mr. Riely] and for what he does, and all the help that he's given to me, to my husband, and to my … family."

---

Charles Miller Wall testified that Mr. Riely is a "very trustworthy, loyal, responsible, hardworking lawyer."

Finally, Walter Steven Smitson spoke about Mr. Riely's "dedication to his children … to his family, to his community, … and to his clients."

[15] The names of former clients were sealed as part of the record before the hearing judge.

Another former client expressed complete satisfaction with Mr. Riely's services, testifying that he is an "honorable person" and "an honest man." She recounted that, at their initial meeting, Mr. Riely "gave us his undivided attention, listened to everything we had to say" and made her and her husband feel like "we actually had an attorney that listened to us." Yet another former client testified that Mr. Riely was "one of the very rare people who … have the highest standards of ethics," that "he truly cares for his clients," and that when visiting his office on numerous occasions, she had witnessed other former and current clients "expressing their sincere gratitude" to him.

Even Ms. Fernandez Gonzalez testified that she will "always be grateful" for Mr. Riely's work on her behalf in 2014, and that he "saved my life." She said that she filed a bar complaint against him in order to obtain relief in her immigration case, and that "I didn't want to file it."[16]

Finally, the hearing judge noted that Mr. Riely had developed a significant reputation in the field of immigration law. In particular, the hearing judge found that Mr. Riely had litigated a seminal case that had been relied upon subsequently to avoid draconian consequences in thousands of immigration cases.[17]

---

[16] It has been observed that bar complaints against immigration attorneys have increased as a result of the decision in *In the Matter of Lozada*, 19 I&N Dec. 637 (BIA 1988), 1988 WL 235454, which required that an immigration client who seeks to reopen an immigration case on the basis of ineffective assistance of counsel must report the attorney to the appropriate disciplinary authority. Melvin Hirshman, *Immigration*, 37 Md. Bar J. (March-April) 59 (2004).

[17] *See In the Matter of Song*, 23 I&N Dec. 173 (BIA 2001), 2001 WL 1030900. In that case, deportation of Mr. Riely's client appeared to be certain because the client had a criminal conviction for a theft offense in Montgomery County. Mr. Riely successfully

## II

### Violations of the Rules of Professional Conduct

The hearing judge concluded that Mr. Riely had committed all of the violations charged by the Commission.  Mr. Riely excepts to a number of these conclusions.  Taking those exceptions into account, we review the hearing judge's conclusions *de novo*.  Maryland Rule 19-741(b)(1).

*Failing to Meet Basic Standards*

The rules of professional conduct require that a lawyer provide competent representation – *i.e.*, apply the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation (Rule 1.1); act with reasonable diligence and promptness in representing the client (Rule 1.3); and ensure that the client is reasonably informed about the status of the matter, comply with the client's reasonable requests for information, and explain a matter to the extent reasonably necessary for the client to make informed decisions (Rule 1.4(a)-(b)).  Conduct that violates one of these three rules almost inevitably violates the others.

As the hearing judge concluded, Mr. Riely violated all three of these rules in his representation of both MC and CS and Ms. Fernandez Gonzalez.

---

persuaded the circuit court to resentence the client, but an immigration judge declined to recognize the resentencing.  Mr. Riely appealed that decision to the federal Board of Immigration Appeals, which reversed the immigration judge's holding.  The decision became binding precedent in immigration proceedings for the next two decades until November 2019, when the United States Attorney General vacated the decision.

In particular, although he was informed on January 27, 2016, that MC and CS had paid the deposit required by the retainer agreement, he did not appear at MC's February 2 hearing, made no attempt to inform MC he would be absent, waited another two and a half months before trying to contact MC, and did not commence any work to obtain a favorable outcome for MC based on a request for the exercise of prosecutorial discretion by immigration authorities. Similarly, although he was aware of the need to obtain detailed information to make an asylum claim on behalf of CS, Mr. Riely apparently took no steps beyond providing her with an asylum application form. He failed to appear for her status hearing on May 12, 2016, despite Ms. Gajardo's attempts to ensure that he would be present.

With respect to Ms. Fernandez Gonzalez, Mr. Riely was not sufficiently thorough and prepared in pursuing the extension of her H-1B visa. As he was no doubt aware, his procrastination and deflection of his client's inquiries threatened to derail what otherwise might have been a routine extension of that visa and put her at risk of removal from the country.

There appears to be little question that Mr. Riely possesses the requisite knowledge and skill to practice immigration law competently. But he fell short of the standard of competence in failing to apply that knowledge and skill with the necessary thoroughness and preparation. We agree with the hearing judge that he violated Rule 1.1 by failing to prepare for and appear at hearings for both MC and CS, failing to adequately pursue their immigration cases, and failing to pursue an extension of the H-1B visa on behalf of Ms. Fernandez Gonzalez. *See Attorney Grievance Comm'n v. Aita,* 458 Md. 101, 132 (2018)

(attorney violated Rule 1.1 when she "failed to notify [the client] of his court dates, failed to appear on his behalf, and failed to adequately pursue the appropriate relief on his behalf").

In failing to make any meaningful effort to advance the immigration cases of MC and CS, Mr. Riely also failed to act with reasonable diligence and promptness.  Even more stark is the case of Ms. Fernandez Gonzalez.  She requested Mr. Riely's assistance in January 2017 – six months before her visa was due to expire in July 2017 and three months before Mr. Riely's recommended filing date of April 2017.  It is evident from their email and text correspondence that Ms. Fernandez Gonzalez was herself a diligent and trusting client.  She persisted in her polite efforts to have Mr. Riely move the matter forward and to ensure that he had timely received the necessary funds to pay both his legal fees and the fees owed to the government.  Mr. Riely's responses appear inattentive, belated, and misleading.

An attorney who does "nothing whatsoever to advance the client's cause or endeavor" fails to act with reasonable diligence.  *Attorney Grievance Comm'n v. Bahgat*, 411 Md. 568, 575 (2009).  We agree with the hearing judge that Mr. Riely violated Rule 1.3 in both of the matters on which the charges against him are based.

Intrinsic to those violations was Mr. Riely's failure to communicate adequately with his clients in both of these matters – to keep them reasonably informed of the extent of his efforts and to provide necessary explanations for them to make informed decisions. Although he knew that neither MC nor CS understood English, he sent correspondence to them in English without confirming that these recent arrivals in the United States had some

means of comprehending that correspondence.  Regardless of that hurdle, during the five

months during which they were his clients, he sent only two brief letters and a blank

Spanish-language form, but apparently made no other effort to communicate the status of

their cases to them.  Most egregiously, he failed to communicate with them about their

status hearings and the simple fact of whether he would attend.  With respect to Ms.

Fernandez Gonzalez, Mr. Riely initially provided only cryptic responses to her inquiries,

apparently concealing his lack of attention to her matter, and later affirmatively misled her

as to his efforts on her behalf.  He clearly failed to comply with her reasonable requests for

information about her visa extension.  We agree with the hearing judge that Mr. Riely

violated Rule 1.4 with regard to both matters.[18]

*Violation Related to Termination of Representation*

Rule 1.16(d) requires a lawyer to protect a client's interests when terminating

representation.  It provides:

> (d)   Upon termination of representation, an attorney shall take
> steps to the extent reasonably practicable to protect a client's interests,
> such as giving reasonable notice to the client, allowing time for
> employment of another attorney, surrendering papers and property to
> which the client is entitled and refunding any advance payment of fee
> or expense that has not been earned or incurred.  The attorney may
> retain papers relating to the client to the extent permitted by other law.

---

[18] Mr. Riely excepts to the hearing judge's conclusion with respect to Rule 1.1 as to
all three of the clients and with respect to Rules 1.3 and 1.4 as to MC and CS.  Essentially,
he ascribes his inaction on behalf of these clients to a failure of MC and CS to provide
necessary information and a failure of Ms. Fernandez Gonzalez to pay fees.  As indicated
in the text, any deficiencies in information or fees appear more attributable to Mr. Riely's
inattention to these matters than to the clients.  *See also* footnote 13 above.  These
exceptions are overruled.

When Mr. Riely decided to terminate his representation of MC and CS – whether it was due to his confusion about whether they had paid the deposit under the retainer agreement or otherwise – he made no effort to inform them of his decision or to ensure that the Pishevar firm immediately returned their deposit to them.  An attorney who terminates an attorney-client relationship without adequate notice violates Rule 1.16(d).  *See Attorney Grievance Comm'n v. Garrett,* 427 Md. 209, 225 (2012).  Moreover, Mr. Riely took no steps to protect the couple's interests.  He was aware that CS would be making an application for asylum, that she had entered the country in September 2016, and that at that time there was a one-year deadline for such application – *i.e.,* September 2017.  However, he apparently made no effort to ensure that she was aware of that deadline or to preserve that claim.

We agree with the hearing judge that Mr. Riely violated Rule 1.16(d).

*Lack of Candor and Truthfulness with Bar Counsel and Others*

Three of the alleged violations are based on a lack of candor or truthfulness.

Rule 4.1(a)(1) provides that "[i]n the course of representing a client an attorney shall not knowingly … make a false statement of material fact or law to a third person."  As the hearing judge concluded, Mr. Riely violated this rule when he represented Ms. Fernandez Gonzalez at her meeting with a DHS agent on October 19, 2017.  He told the DHS agent that he could not understand why the agent could not find a receipt number for a visa extension filing on behalf of Ms. Fernandez Gonzalez and that he would later document that filing for the DHS agent.  At the time, Mr. Riely was well aware that he had not made a filing on behalf of Ms. Fernandez-Gonzalez.  Whether he had made such a filing was a

fact material to her effort to renew her H-1B visa, as well as to the removal proceedings that had been initiated by DHS.[19]

Rule 8.1(a) provides that "an attorney … in connection with a disciplinary matter, shall not … knowingly make a false statement of material fact."  As the hearing judge concluded, Mr. Riely violated this rule in his March 1, 2018 letter to Bar Counsel.  In that letter, he told Bar Counsel that, when asked by Ms. Fernandez Gonzalez whether he had received the filing fees for USCIS from her employer, he "consistently told her no," and that she promised "it would be forthcoming but it never was."  The emails and text messages between Mr. Riely and Ms. Fernandez Gonzalez admitted at the hearing do not support that statement.  It appears that, in fact, Mr. Riely sent the invoice for those fees to an incorrect address and, although he did not receive a check for those fees, did not alert Ms. Fernandez Gonzalez or Mr. Sanchez about that deficiency.  Indeed, he misled her to believe that he had made the requisite filings (and thus presumably had received funds for the filing fees), but had not been paid his legal fee.  The hearing judge concluded that Mr. Riely's inaccurate statement in his letter to Bar Counsel was made knowingly to advance a false narrative about what had occurred.[20]

_____

[19] Mr. Riely excepts to the hearing judge's finding that his statements at this meeting violated Rule 4.1, arguing that it was an adversarial proceeding in which he was trying to avoid issues detrimental to his client.  Mr. Riely's bluster at that meeting, while it may have concealed his own shortcomings in his representation of Ms. Fernandez Gonzalez, could well have hurt her efforts in the long run when the agent uncovered the truth.  In any event, there is no question that Mr. Riely's questions and statements to the agent were misleading, as he well knew.  This exception is overruled.

[20] Mr. Riely excepts to the hearing judge's conclusion that he violated Rule 8.1(a) for the same reason that he excepted to the hearing judge's finding that he made a

Rule 8.4(c) provides that "[i]t is professional misconduct for an attorney to … engage in conduct involving dishonesty, fraud, deceit or misrepresentation."  The statements made by Mr. Riely to the DHS agent and to Bar Counsel that constitute violations of Rule 4.1(a)(1) and 8.1(a) also violated Rule 8.4(c) as they were each "conduct involving … misrepresentation."  *See Attorney Grievance Comm'n v. Singh,* 464 Md. 645, 677 (2019) (violation of Rule 8.1(a) also violates Rule 8.4(c)); *Attorney Grievance Comm'n v. Maldonado,* 463 Md. 11, 39-40, 45-47 (2019) (attorney violated both Rule 4.1 and 8.4(c) in misrepresenting her credentials in communications with a third party).  Moreover, as the hearing judge found, Mr. Riely also misled Ms. Fernandez Gonzalez about the status of his efforts on behalf of her visa extension.

We agree with the hearing judge that Mr. Riely violated all three of these rules.

*General Violations*

Finally, Mr. Riely was charged with violating Rule 8.4(a) and (d).  Those rules provide:

> It is professional misconduct for an attorney to:
>
> (a)     violate or attempt to violate the [MARPC] …;
>
> (d)     engage in conduct that is prejudicial to the administration of justice;

As we have already concluded that Mr. Riely violated several rules of professional conduct, a violation of Rule 8.4(a) is also established and no further discussion is necessary.

---

misrepresentation in his letter to Bar Counsel.  We overruled that exception, *see* footnote 13 above, and for the same reasons, overrule this exception as well.

This Court has characterized conduct as "prejudicial to the administration of justice" when it negatively affects the public perception of the legal system or the legal profession. *Attorney Grievance Comm'n v. Rand,* 411 Md. 83, 96 (2009). Perhaps more importantly, conduct is prejudicial to the administration of justice when it affects the actual operation or "efficacy" of the legal system. *Id.* Mr. Riely's inattentiveness to his clients and misrepresentations certainly reflect poorly on the legal profession. While the difficulties those violations caused those clients were ultimately rectified by the efforts of successor counsel with his assistance, his conduct necessarily detracted from the efficacy of the immigration legal system.

We agree with the hearing judge that Mr. Riely committed these violations.

### III

### Sanction

As this Court has frequently stated, the sanction imposed in an attorney disciplinary proceeding is intended to protect the public from an errant attorney, to deter similar misconduct by others, and to maintain public confidence in the legal profession. *E.g., Attorney Grievance Comm'n v. Yates*, 467 Md. 287, 306 (2020). As the sanction must be tailored to the particular facts of a case, we consider a number of aggravating and mitigating factors. We typically use a list of such factors that has been developed by the American Bar Association. *See Attorney Grievance Comm'n v. Blatt*, 463 Md. 679, 707-8 n.19 (2019) (listing aggravating and mitigating factors).

*Aggravating and Mitigating Factors*

In this case, the hearing judge found that three aggravating factors were proven by clear and convincing evidence: *experience in the practice of law, vulnerable victims, and multiple offenses*. These findings are amply supported by the record. At the time of the misconduct, Mr. Riely had practiced for more than 30 years and was very experienced in immigration law. Immigrants, especially those at risk of removal from the United States, are a marginalized group that this Court has recognized as vulnerable victims of professional misconduct. *Attorney Grievance Comm'n v. Landeo*, 446 Md. 294, 352-53 (2016). As a technical matter, there are multiple offenses found in virtually every attorney disciplinary case as a particular action, or omission, by an attorney may violate multiple rules of professional conduct. Perhaps a more telling benchmark is how many "episodes" those violations relate to. This case involves two separate representations undertaken by Mr. Riely.[21]

We also conclude, as urged by Bar Counsel in one of its exceptions, that Mr. Riely's misrepresentation in his March 2018 letter to Bar Counsel amounted to a *deceptive practice during the disciplinary process*. In that letter, Mr. Riely attempted to deflect blame to the

---

[21] Bar Counsel argues, in one of its exceptions, that the hearing judge should have found a *pattern of misconduct* as well as *multiple offenses*. Although conceding that the "circumstances of the two cases were different," Bar Counsel argues that the violation of some of the same rules in the two matters establishes a pattern. Mr. Riely had what appears to be a high-volume immigration practice that, for the prior 30 years, had apparently been without incident. We decline to characterize these two matters as a "pattern of misconduct." This exception is overruled.

41

client for his inaction in 2017 on her behalf.  Candor and clarity in representations made to Bar Counsel during an investigation is essential to the disciplinary process.

The hearing judge found several mitigating factors present that favored Mr. Riely. It was undisputed that Mr. Riely has *no prior disciplinary record*.  The hearing judge noted that Mr. Riely had experienced a *personal problem* during the period of those representations in the form of a serious health issue.  He found that the *remorse* Mr. Riely expressed at the hearing was genuine and cited his *good character and reputation* – which was amply supported by the many clients and colleagues who testified on his behalf.  The hearing judge noted that, after the initial misdirection in his first letter to Bar Counsel concerning Ms. Fernandez Gonzalez's matter, Mr. Riely *cooperated with Bar Counsel's investigation*.  Finally, the hearing judge found that Mr. Riely made *good faith efforts to rectify his misconduct* in assisting successor counsel.[22]  It is also notable that Mr. Riely apparently did not profit financially from either of these representations.[23]

---

[22]  Bar Counsel excepts to some of these findings, including:  (1) that personal problems influenced his decision-making; (2) that he made good faith efforts to correct the consequences of his misconduct; and (3) that he sufficiently cooperated with Bar Counsel's investigation.  We note that mitigating factors need be proven only by a preponderance of the evidence.  Maryland Rule 19-727(c).  We cannot say that the hearing judge's findings with respect to these factors are clearly erroneous.

[23]  At the hearing it was undisputed that Mr. Riely promptly refunded the $1,500.00 he received from Mr. Sanchez upon termination of his representation in late December 2017, more than a month before Ms. Fernandez Gonzalez sent a complaint to Bar Counsel.

With respect to the MC and CS matter, there is no indication in the record that Mr. Riely received any of the $300 that they paid to the Pishevar firm in January 2016.  As recounted in the text of this opinion, in April 2016, Ms. Gajardo told Mr. Riely in an email that she planned to return those funds to Guatemalan couple if Mr. Riely did not continue

In an issue involving both an aggravating factor and a mitigating factor, the parties spar over the motives underlying Mr. Riely's misconduct.  Bar Counsel excepts to the hearing judge's finding that there was a *lack of a dishonest or selfish motive* – a mitigating factor – and to the hearing judge's correlative decision *not* to find a *dishonest or selfish motive* – an aggravating factor.  Here we arrive at a split decision.  We agree with Mr. Riely that there is no evidence – much less clear and convincing evidence – that his violations of basic standards of attorney conduct – competence (Rule 1.1), diligence (Rule 1.3), communication (Rule 1.4), and the like – were the result of any dishonest motive or intention to enrich himself to the detriment of his clients.  But while he later threw himself on his sword in admitting to immigration authorities that he had provided ineffective representation to these clients, he was not completely truthful – and, at times misleading (as the hearing judge found) – as to why he had provided ineffective assistance, apparently in an effort to conceal his own failings.  In that respect, the violations based on misrepresentations involved a *selfish or dishonest motive*.  Accordingly, we grant in part and deny in part Bar Counsel's exceptions as to these two factors.

*Discussion*

Bar Counsel has recommended that we disbar Mr. Riely from the practice of law in Maryland.  Mr. Riely has suggested that a public reprimand would be a more appropriate sanction.[24]  For the reasons set forth below, we opt for neither of these extremes.

_____

his representation.  A few weeks later, Mr. Riely told her he was closing his file in the matter.  Neither MC nor CS testified at the hearing.

[24] At the outset of this case, Mr. Riely's counsel raised certain defenses and sought to limit the discipline to a reprimand based on negotiations that took place in 2018 between

_____

Mr. Riely's initial counsel and two former Assistant Bar Counsel who had charge of the investigation of Mr. Riely during that period. The hearing judge made certain findings in the event this Court required a factual record to address the effect of those negotiations and Mr. Riely's alleged defenses.

During those negotiations, Mr. Riely's counsel suggested that the matter be resolved through a conditional diversion agreement. The Assistant Bar Counsel who was then assigned to the case rejected that idea but countered with an unqualified offer of a reprimand by the Commission. That offer was renewed when another Assistant Bar Counsel took over the case after the predecessor attorney left the Office of Bar Counsel. Mr. Riely's counsel indicated that his client would likely accept the offer, but before Mr. Riely did so, the second Assistant Bar Counsel revoked the offer on the instructions of "higher-ups." Before us, Bar Counsel conceded that her office had made a "mistake" and accepted responsibility for it, but represented that she had not been aware of the negotiations conducted by her subordinates until January 2019, when the offer was withdrawn.

In his Answer to the Petition for Disciplinary or Remedial Action, Mr. Riely asserted defenses of "executory accord" and "accord and satisfaction." (Mr. Riely later conceded that "accord and satisfaction" was not applicable). Neither defense has merit in this context. The aborted negotiations between Mr. Riely's former counsel and the two former Assistant Bar Counsel do not affect the disposition of this case. The disposition under discussion during those negotiations – a Commission reprimand – is governed by Maryland Rule 19-717. That rule provides for Bar Counsel, or a Peer Review Panel, to make a detailed "written offer" of a reprimand. Maryland Rule 19-717(a)-(b). If the respondent attorney accepts the offer, the proposed reprimand is submitted to the Commission which may accept, reject, or amend it. Maryland Rule 19-717(d)-(e). If the Commission disapproves of the proposal, or if the parties reject any amendments made by the Commission, the disciplinary investigation and proceeding resume and the failed negotiations have no bearing on that proceeding. Maryland Rule 19-717(f).

In this case, the parties had not taken even the first step toward a Commission reprimand – a written offer – and, even had they done so, there remained several more steps that may ultimately have led to a dead end. The truncated negotiations of counsel did not require Bar Counsel to recommend a reprimand to resolve the case. There is no suggestion that either former Assistant Bar Counsel purported to guarantee Commission approval of a reprimand and anyone who read the rule would not expect that they could. Moreover, at this stage of the case, this Court is not bound by such a recommendation, even if Bar Counsel were to endorse it.

In his opinion, the hearing judge found that the Office of Bar Counsel had entered into a "verbal agreement" for a public reprimand. Although lauding the "outstanding

The violations that arose from the matter involving MC and CS appear to stem from poor communication – or perhaps poor memory on Mr. Riely's part.  It is evident from many of the documents admitted at the hearing – as well as the testimony of his other clients – that Mr. Riely promptly responded at all hours of the day and night to communications about client matters.  Mr. Riely's texts and emails with his liaison to the Pishevar firm (Ms. Gajardo) document that there was initial uncertainty after the meeting with the Guatemalan couple whether they intended to follow up and retain Mr. Riely's services through that firm.  But the texts and emails with Ms. Gajardo also document that, approximately three weeks after the meeting, Mr. Riely eventually was informed that they had paid the $300 deposit and were expecting him to represent them.   Mr. Riely

---

attorneys" of the Office of Bar Counsel, he expressed concern that the Office had effectively engaged in bad faith negotiations in the matter that would not be countenanced in a prosecutor's office and that the standard of "fair play and equity" required of attorneys who exercise such government powers had not been met.

Bar Counsel has moved to strike the portion of the hearing judge's opinion that includes the findings related to these negotiations.  Although we find the defenses raised by Mr. Riely without merit, we decline to strike the findings on which that decision is based.  To the extent Bar Counsel's motion should be understood as an exception to the hearing judge's findings, we grant it only to the extent set forth in this footnote.

It is, of course, necessary for attorneys such as prosecutors and Assistant Bar Counsel to initiate discussions of a potential disposition of a case without unnecessarily constraining the public interest or misleading the opposing side.  Such discussions require clarity in what is being proposed – that a proposed disposition is based on an attorney's own view of what he or she knows of the case at the time of the discussion and, if the proposal awaits approval by "higher-ups," a clear indication of that qualification.  Such clarity is particularly important on the part of those who exercise public authority.

We trust that the experience of having confronted the issue in this case will result in improved communication in the future, both internally and externally, as to Bar Counsel's position on a pre-hearing resolution of a disciplinary proceeding.

acknowledged receipt of that information, but did not follow through adequately – which likely was responsible for CS's failure to file her petition for asylum within the period of limitations. Although successor counsel was able to obtain relief from immigration authorities, Mr. Riely's mishandling of the case created the potential for serious adverse consequences for the asylum petition, on which the family's hope of remaining in the United States depended. Had this matter been Mr. Riely's only misconduct, it might well be that a reprimand or short suspension would be the appropriate discipline.

But his misconduct reached another order of magnitude in Ms. Fernandez Gonzalez's matter. In Ms. Fernandez Gonzalez and Mr. Sanchez, Mr. Riely had diligent and cooperative clients who were clearly willing to pay the requisite fees. The confusion about the payment of fees was attributable to Mr. Riely, as was his failure to move the matter forward on the timeline he himself had specified. Mr. Riely fended off his client's inquiries about the status of her visa extension application with cryptic deflections and ultimately found himself misleading not only his client but also an immigration enforcement agent and ultimately Bar Counsel. These misleading statements amount to misrepresentations that cannot be ignored in fashioning an appropriate sanction.

On the other hand, we also cannot ignore that Mr. Riely has had a long, and apparently distinguished, career in the practice of immigration law. The misconduct in this case, although serious, was not motivated by a lawyer's decision to profit at the expense of his clients, but began as a failure to attend to the details of the matters he had agreed to undertake on behalf of those clients and, most seriously, his effort to minimize and conceal his own mistakes in that regard.

46

An analogous prior decision of this Court is *Attorney Grievance Comm'n v. Koven*, 361 Md. 337 (2000).  The respondent in that case was hired to file applications with the federal government for alien labor certifications for three employees.  Although he was paid his full fee for that work, the attorney prepared only two of the applications and never filed any of them.  He lied repeatedly to the clients that he had made the filings and created fictitious documents to lead them to believe that the government was processing their applications.  When his representation was terminated, he never refunded the money that he had been paid.  Nor did he cooperate with successor counsel or Bar Counsel.

The hearing judge in *Koven* found that the attorney had committed the same violations as in this case and, in addition, a violation of Rule 8.4(b) (criminal conduct).  The hearing judge did not find any mitigating factors.  This Court concluded that the attorney had committed all of the violations found by the hearing judge and, after reviewing cases involving similar violations, imposed an indefinite suspension with a right to reapply after two years.

While this case is similar to *Koven,* the various mitigating factors found by the hearing judge distinguish this case from *Koven* and inure in Mr. Riely's favor – in particular, the refund of the fee he received, his cooperation with successor counsel to remedy his misconduct, and his lengthy and otherwise unblemished record as an attorney. As in *Koven*, we will suspend Mr. Riely indefinitely from the practice of law in Maryland. But the mandatory "sit-out" period shall not be as long.[25]

---

[25] The Dissenting Opinion suggests that the Court's decision in *Attorney Grievance Comm'n v. Vanderlinde*, 364 Md. 376 (2001) means that *Koven* is no longer good law.

*Conclusion*

In our view, an indefinite suspension with a right to apply for reinstatement no sooner than one year is the appropriate sanction in this case.  The suspension shall begin 30 days after the date on which this opinion is filed.

IT IS SO ORDERED.  RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JOHN T. RIELY.

---

Dissenting Opinion at 8-9 n.2.  However, it is notable that the same judge authored both the *Koven* decision and the *Vanderlinde* decision within a few months of each other during the same term.  The Court has cited *Koven* at least a half-dozen times subsequent to *Vanderlinde* (as well as in the *Vanderlinde* decision itself).  As the Dissenting Opinion appears to acknowledge, even after *Vanderlinde*, this Court has found that "disbarment is not always the appropriate sanction when there is misrepresentation involved, especially where misappropriation of money was not involved."  *Attorney Grievance Comm'n v. Duvall*, 373 Md. 482, 497 (2003) (Bell, C.J., concurring) (internal quotation marks and citations omitted).  This Court has frequently stated that the sanction in an attorney disciplinary matter is to be based on the particular facts and circumstances of the case. *E.g.*, *Attorney Grievance Comm'n v. Hodes*, 441 Md. 136, 205-6 (2014).  The facts of *Koven* are remarkably similar to those of this case, except more egregious and without any mitigation.

Circuit Court for Montgomery County
Case No. 471876-V

Argued: September 10, 2020

<u>IN THE COURT OF APPEALS</u>

<u>OF MARYLAND</u>

Misc. Docket AG No. 20

September Term, 2019

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

JOHN T. RIELY

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Dissenting Opinion by Watts, J.

_____

Filed: November 25, 2020

Respectfully, I dissent as to the sanction imposed by the Majority.  Unlike the

Majority, I would follow Bar Counsel's recommendation and disbar John T. Riely,

Respondent.[1]  In my view, the Majority's determination that an indefinite suspension with

the right to apply for reinstatement no sooner than one year is the appropriate sanction in

this case is not persuasive.  In reaching its determination as to the appropriate sanction, the

Majority seems to view Riely's misconduct in the most benign light possible.

Here, chief among other misconduct, Riely violated Maryland Lawyers' Rule of

Professional    Conduct    ("MLRPC")    8.4(c)    (Dishonesty,    Fraud,    Deceit,    or

Misrepresentation) by intentionally making misrepresentations of material fact to Mariana

Fernandez Gonzalez, one of his clients, Special Agent Melinda LeCompte, a law

enforcement agent with the United States Department of Homeland Security, and Bar

Counsel.  Riely's misrepresentations to Special Agent LeCompte constituted violations of

MLRPC 4.1(a)(1) (Making a False Statement of Material Fact to a Third Person).  And,

Riely's misrepresentations to Bar Counsel constituted violations of MLRPC 8.1(a)

(Making a False Statement of Material Fact to Bar Counsel).

In addition to his dishonesty-related misconduct, Riely violated multiple other

MLRPC while representing clients in two separate matters: MC and CS, and Fernandez

Gonzalez.  Riely violated MLRPC 1.1 (Competence) and 1.3 (Diligence) by failing to do

what MC, CS, and Fernandez Gonzalez had retained him to do.  Riely violated of MLRPC

1.4(a)(2) (Keeping a Client Reasonably Informed) and 1.4(b) (Explaining a Matter to a

---

[1]Bar Counsel recommends that we disbar Riely.  For his part, Riely requests a reprimand.

Client) by failing to keep MC, CS, and Fernandez Gonzalez reasonably informed and failing to sufficiently explain matters to them.  Riely violated MLRPC 1.4(a)(3) (Complying with Reasonable Requests for Information) by failing to respond to Fernandez Gonzalez's reasonable requests for information.  Riely violated MLRPC 1.16(d) (Terminating Representation) by failing to take any steps to protect MC's and CS's interests after he decided to stop representing them.  Finally, Riely violated MLRPC 8.4(d) (Conduct that is Prejudicial to the Administration of Justice) in connection with his representation of MC, CS, and Fernandez Gonzalez because his conduct would negatively impact a reasonable member of the public's perception of the legal profession.

In addition to being dishonest and occurring with respect to his representation of multiple clients, Riely's misconduct posed serious consequences for the clients.  Because Riely failed to file a Form I-129 to request an extension of Fernandez Gonzalez's H-1B visa, failed to inform her as much, and misrepresented to her that he had filed the form, Fernandez Gonzalez's H-1B visa expired, and it became illegal for her to remain in the United States.  A consequence of Fernandez Gonzalez's H-1B visa's expiration was that she lost her driver's license.  As Fernandez Gonzalez stated in a letter to Riely, because she lost her driver's license, she was unable to drive her car for months, which forced her to rely on others and incur substantial unnecessary transportation expenses.  Even more importantly, another consequence of Fernandez Gonzalez's H-1B visa's expiration was that the United States Department of Homeland Security initiated a removal proceeding against her.  Agents of the United States Department of Homeland Security visited Fernandez Gonzalez's workplace looking for her, and directed her to meet with Special

Agent LeCompte at their office.  When Fernandez Gonzalez visited the office, she was served with a warrant for her arrest and temporarily detained for remaining in the United States without authorization.  In her letter to Riely, Fernandez Gonzalez stated that the consequences of his failure to file Form I-129 to request an extension of her H-1B visa were "dreadful[,]" made her "very upset[,]" and caused her "significant emotional and physical stress."  (Emphasis omitted).  Additionally, because of Riely's failures of competence and diligence, both MC and CS attended Master Calendar hearings in their removal proceedings without counsel.  It was only thanks to the efforts of Fernandez Gonzalez's new counsel and MC's and CS's new counsel, respectively, that the United States Citizenship and Immigration Services retroactively extended Fernandez Gonzalez's H-1B visa, and that the Baltimore Immigration Court considered the merits of CS's case for being granted asylum.  The circumstance is that it is not that Riely's misconduct did not harm his clients; rather, the reality is that the actions of new counsel resolved the damage that Riely caused.

I agree with the Majority that Riely's misconduct is aggravated by experience in the practice of law, vulnerable victims, multiple offenses, deceptive practice during the disciplinary process, and a selfish or dishonest motive.  See Maj. Slip Op. at 41-42, 44.  I disagree, though, with the Majority's decision to overrule Bar Counsel's exception to the hearing judge's finding that Riely did not engage in a pattern of misconduct.  See id. at 42 n.21.  Riely violated the same three MLRPC (1.1, 1.3, and 1.4) while representing different sets of clients (MC/CS and Fernandez Gonzalez) in two different years (2016 and 2017, respectively).  These circumstances are sufficient to establish a pattern of misconduct.

I agree with the Majority that Riely's misconduct is mitigated by a lack of a prior disciplinary record, a personal problem, remorse, and good character and reputation, and is not mitigated by a lack of a selfish or dishonest motive.  See id. at 42-43.  I disagree, though, with the Majority's overruling of Bar Counsel's exceptions to the hearing judge's findings that Riely engaged in timely good faith efforts to make restitution or rectify the consequences of his misconduct and had a cooperative attitude toward the attorney discipline proceeding.  See id. at 43 n.22.  As to the latter mitigating factor, it is inconsistent for the Majority to determine that Riely had a cooperative attitude toward the disciplinary process when he engaged in a deceptive practice in his letter to Bar Counsel responding to Fernandez Gonzalez's complaint, even if he later cooperated with Bar Counsel's investigation of the complaint after what the Majority labels "the initial misdirection[.]"  Id. at 42-43.  In my view, the circumstance that Riely lied to Bar Counsel precludes a determination, as a mitigating factor, that he had a cooperative attitude toward the disciplinary proceedings.  In other words, I agree with Bar Counsel that it is unjustifiable to give an attorney who lied to Bar Counsel during the investigation credit for being cooperative at a later stage.  I would sustain Bar Counsel's exception and conclude that the hearing judge clearly erred in finding a cooperative attitude toward the attorney discipline proceeding where the evidence indisputably established that Riely misled Bar Counsel.

I would also determine that the hearing judge clearly erred in finding that Riely made timely good faith efforts to make restitution or rectify the consequences of his misconduct "by participating with the complainants' new counsel to address the effects of his actions."  Insofar as assistance to complainants' new counsel is concerned, the hearing

judge's opinion does not indicate that Riely took any steps whatsoever to assist MC's and CS's new counsel.  Indeed, the hearing judge found that Riely "failed take any steps or provide any guidance to MC and CS to protect their interests upon ending his representation of them."

Ostensibly, in finding that Riely participated with the complainants' new counsel to address the effects of his actions, the hearing judge was referring to a January 18, 2018 letter that Riely wrote in response to Fernandez Gonzalez's new counsel's request that he write a letter regarding his failure to file Form I-129.  Riely's January 18, 2018 letter was dated nearly a month after December 21, 2017, the point at which Fernandez Gonzalez ended his representation.  The nearly one-month delay between Riely being terminated and the January 18, 2018 letter, along with the circumstance that Fernandez Gonzalez's new counsel requested the letter, rebuts the notion that his efforts to help Fernandez Gonzalez were timely or self-initiated.  Even more telling, the hearing judge found that the January 18, 2018 letter contained misrepresentations.  For example, the hearing judge found that Riely falsely stated that he "replied no" to Fernandez Gonzalez's question about whether he had received a second check from her employer to cover fees, and he made the misleading statement that he "caused [Form] I-129 and the supporting materials and memorandum to be drafted[.]"  The circumstance that Riely included self-serving misrepresentations in the January 18, 2018 letter squarely conflicts with the hearing judge's finding that his efforts to help Fernandez Gonzalez were in good faith.  I would sustain Bar Counsel's exception.  All of that having been said, the disparities between the aggravating factors and mitigating factors that the Majority found, and those that I would determine, do

not affect my view regarding the appropriate sanction.

Even with the mitigating and aggravating circumstances determined by the Majority, disbarment clearly is the appropriate sanction. This case calls to mind the saying: "The cover-up is worse than the crime." Riely failed to file Form I-129 to request an extension of Fernandez Gonzalez's H-1B visa. Though serious, that lapse, without more, would not justify disbarment. But, Riely made the problem worse by engaging in intentional dishonesty to cover up his lapse. Riely lied to Fernandez Gonzalez by indicating to her that he had filed Form I-129 to request her H-1B visa extension, that he could reconstruct the documents that he had filed with the United States Citizenship and Immigration Services, and that he had sent a hard copy of documents to the United States Citizenship and Immigration Services. Riely lied to Special Agent LeCompte by telling her that he could not understand why she could not find any record that he filed Form I-129, and that he would send her papers that demonstrated that he had done so. Riely lied to Bar Counsel by stating that he had responded in the negative after Fernandez Gonzalez asked him whether he had received the filing fees, and that she promised, but failed, to provide the filing fees. Simply put, Riely lied to his client, a law enforcement agent, and Bar Counsel to cover his tracks, thereby engaging in new violations of the MLRPC to hide existing ones.

The hearing judge found that Riely's misrepresentations to Fernandez Gonzalez regarding reconstructing the documents that he had filed and sending a hard copy of documents to the United States Citizenship and Immigration Services constituted "an apparent attempt to conceal his neglect" of her matter. The hearing judge found that Riely

made false statements to Bar Counsel regarding him consistently responding in the negative when Fernandez Gonzalez asked whether her employer had provided the filing fees and regarding her inaccurately telling him that the filing fees were forthcoming "for the purpose of advancing a false narrative about what had occurred."  The self-serving nature of Riely's lies to Fernandez Gonzalez and Bar Counsel makes them even more egregious.  Additionally, Riely's lies to Fernandez Gonzalez had the unfortunate effect of duping her into mistakenly believing that the United States Citizenship and Immigration Services had timely received Form I-129 to request an extension of her H-1B visa before it expired.

Because Riely engaged in intentionally dishonest conduct with Fernandez Gonzalez, Special Agent LeCompte, and Bar Counsel, compelling extenuating circumstances would be necessary to justify a sanction other than disbarment.  See Attorney Grievance Comm'n v. Miller, 467 Md. 176, 228, 223 A.3d 976, 1006 (2020).  The mitigating factors that I would find, and those that the Majority determines, see Maj. Slip Op. at 42-43, are a far cry from constituting compelling extenuating circumstances.  The lack of compelling extenuating circumstances alone is sufficient to warrant disbarment.  But, as if that is not enough, Riely's misconduct includes not only multiple instances of dishonesty, but also other forms of misconduct, including a lack of competence and diligence, the failure to properly communicate with clients, and the failure to protect his clients' interests after the termination of his representation of them.  The conclusion that disbarment is the appropriate sanction is even more warranted given that Riely's multiple instances of intentional dishonest conduct are accompanied by numerous other

violations involving a failure to adequately safeguard his clients' interests.  In light of all of the above and the aggravating factors determined the Majority, especially the factor of dishonest or selfish motive, disbarment is the appropriate sanction.

"[D]isbarment is generally the appropriate sanction for intentionally dishonest conduct, unless an attorney can establish the existence of compelling extenuating circumstances justifying a lesser sanction." Miller, 467 Md. at 228, 223 A.3d at 1006 (cleaned up).  In Attorney Grievance Comm'n v. Cocco, 442 Md. 1, 13, 109 A.3d 1176, 1183 (2015), this Court aptly observed: "Time and again, we have reached the conclusion that disbarment is the appropriate sanction for intentional misrepresentations, particularly when they cast disrepute upon the public perception of lawyers."  (Citation omitted).[2]

---

[2]I am aware that in Attorney Grievance Comm'n v. Koven, 361 Md. 337, 345, 761 A.2d 881, 885 (2000), the case that the Majority relies on in determining that an indefinite suspension is appropriate, this Court imposed an indefinite suspension with the right to apply for reinstatement no sooner than two years for seemingly similar misconduct, including intentional dishonesty.  The imposition of the sanction in Koven, however, predated this Court's opinion in Attorney Grievance Comm'n v. Vanderlinde, 364 Md. 376, 773 A.2d 463 (2001).  Vanderlinde, id. at 418, 773 A.2d at 488, is the seminal case in which this Court stated:

> Upon reflection as a Court, in disciplinary matters, we will not in the future attempt to distinguish between degrees of intentional dishonesty based upon convictions, testimonials or other factors.  Unlike matters relating to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse.  Honesty and dishonesty are, or are not, present in an attorney's character.
>
> Disbarment ordinarily should be the sanction for intentional dishonest conduct.  With our opinion today, we impress upon the members of the bar that the Court does not consider [certain prior] cases to be authority for an argument for leniency in attorney disciplinary matters involving intentionally dishonest conduct.

Taking Riely's misconduct into account, especially his intentionally dishonest conduct in

multiple instances, disbarment is warranted.   We must protect the public, particularly

vulnerable members of the public, from dishonesty, and deter lawyers from engaging in

---

To be sure, since Vanderlinde, this Court has imposed a sanction less than disbarment where the circumstances involved dishonesty.   Post-Vanderlinde, however, Koven has not been cited for the proposition that misconduct involving intentional dishonesty warrants the sanction of an indefinite suspension.   Since Vanderlinde, Koven has been cited in five opinions of this Court and one dissent.   In one instance, in an attorney discipline proceeding that did not involve dishonest conduct, this Court cited Koven and another prior case after stating that the attorney's "violations [were] in the nature of serious neglect for which the Court has typically imposed an indefinite suspension."   Attorney Grievance Comm'n v. Moore, 447 Md. 253, 273, 135 A.3d 390, 401 (2016).   Koven has been cited in other opinions, and in a footnote in Vanderlinde, for the general well-established principle that the purpose of a sanction is to protect the public.   See Attorney Grievance Comm'n v. Hayes, 367 Md. 504, 519, 789 A.2d 119, 129 (2002); Attorney Grievance Comm'n v. Santos, 370 Md. 77, 87, 803 A.2d 505, 510-11 (2002); Attorney Grievance Comm'n v. Culver, 371 Md. 265, 277 & n.12, 808 A.2d 1251, 1258 & n.12 (2002); Vanderlinde, 364 Md. at 387 n.6, 773 A.2d at 469 n.6.   In Vanderlinde, this Court did not cite Koven for any other proposition, much less for the notion that Koven remained good law and/or authority for imposing suspensions for intentional dishonest conduct after Vanderlinde.   In none of the cases above in which Koven has been cited since Vanderlinde was the attorney found to be in violation of MLRPC 8.4(c), the rule involving dishonesty.

Koven was cited as an example of a violation of MLRPC 8.4(c) and MLRPC 8.4(d), see Attorney Grievance Comm'n v. Blum, 373 Md. 275, 301, 818 A.2d 219, 234 (2003), and in a dissenting opinion as an example of a violation of MLRPC 8.4(d), see Attorney Grievance Comm'n v. Sheinbein, 372 Md. 224, 277 n.12, 812 A.2d 981, 1012 n.12 (2002) (Eldridge, J., dissenting).   In Blum, 373 Md. at 303, 305, 818 A.2d at 236, 237, a case citing Koven after Vanderlinde, the attorney, who violated MLRPC 8.4(c), among other MLRPC, was disbarred.

In comparing the severity of the misconduct in this case with that in Koven, in Koven, 361 Md. at 343-45, 761 A.2d at 884-85, unlike this case, there were no aggravating factors assessed and no discussion of harm or damage to the clients involved.   Of course, each case must be assessed on its own facts and circumstances; nonetheless, Vanderlinde indicates that disbarment generally is the appropriate sanction for intentional dishonest conduct, which is the exact type of conduct that Riely repeatedly engaged in.   And, Koven was decided at a time when this Court had not determined that the sanction for intentional dishonesty is generally disbarment and has not been cited by this Court since as precedent for imposing an indefinite suspension for misconduct involving intentional dishonesty.

intentional dishonesty to protect themselves and to cover up their misconduct as Riely did.

    For the above reasons, respectfully, I dissent.